UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| US INVENTOR INC., TINNUS ENTERPRISES, LLC, 10TALES, INC., STRAGENT, LLC, 360 HEROS, INC., RAMZI MAALOUF, LARRY GOLDEN, WORLD SOURCE ENTERPRISES, LLC and E-WATCH, INC., <br><br>Plaintiffs, <br><br>v. <br><br>DREW HIRSHFELD, in his official capacity Performing the functions and duties of the Under Secretary of Commerce for Intellectual Property and Director, United States Patent and Trademark Office, <br><br>Defendant. | § § § § § § § § § § § § § § § § § § § § | Civil Action No. 2:21-cv-00047 |

**PLAINTIFFS' SUR-REPLY IN SUPPORT OF THEIR
OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

I.  ALL PLAINTIFFS POSSESS ARTICLE III STANDING ................................................. 1

II.  COUNT I PLEADS A CAUSE OF ACTION .................................................................. 4

III.  COUNT II PLEADS A CAUSE OF ACTION ................................................................. 6

    A.  Designation of Precedential Institution Standards is Final Agency Action ............. 6

    B.  Precedential Institution Standards are Not General Statements of Policy ............... 9

IV.  CONCLUSION ............................................................................................................... 10

I.     **ALL PLAINTIFFS POSSESS ARTICLE III STANDING**

<u>Patent Owner Plaintiffs</u>: If the Director broke the law but all Plaintiffs lack standing to raise that, then no one does. How can the Director be compelled to follow the law, if not by the inventors he harmed? As Plaintiffs argued, standing exists because of increased risk to protectible interests. The law requires this Court to assume challenged agency action is "unlawful" in deciding this motion. (ECF#20, at 4-5). The Director recharacterizes the argument as: "Plaintiffs base their supposed standing on the risk of a <u>lawful</u> harm to their interests." (Reply at 3). But at the Rule 12 stage, the harm must be assumed to be based on unlawful action or inaction. *Texas v. United States*, 945 F.3d 355, 383 (5th Cir. 2020). Properly framed, the Director cannot rebut Article III injury-in-fact. The Director concedes that "risk" to a protectible interest conveys standing. (Reply at 3). Reducing availability of "off-ramps" to AIA trial institutions constitutes increased risk.

Plaintiff Ramzi Maalouf, for example, raised discretionary arguments against institution of Microsoft's IPR filed against him (IPR2020-00483), but had to do so in the absence of prior notice-and-comment rulemaking on such institution standards. (ECF#6, ¶ 18). Microsoft sought IPR, even though no litigation exists on that patent; *i.e.*, there was ***zero risk*** outside of this IPR of Plaintiff Maalouf's patent being held invalid or cancelled. (ECF#6, ¶ 38). Comparatively, Plaintiff Maalouf now faces an 84% risk of invalidity or cancellation because of the discretionary institution. (ECF#6, at ¶ 26). Meanwhile, his PTAB panel has suggested that it will abide by this Court's directives if it holds the Director's actions unlawful. (ECF#6, ¶ 18). Plaintiff Maalouf's plight meets all Article III criteria of injury-in-fact (increased risk to property interests from impossible to 84%), immediacy (it is happening to him now) and redressability (this Court can fix it).

Plaintiff Maalouf's situation also lays bare the Director's futile challenge to the statistics. (Reply at 4). Plaintiffs pleaded (ECF#6, at ¶26) and presented evidence (ECF#8-1, at ¶ 11) that

when there is parallel litigation (as with several different Plaintiffs), the PTAB grant decision shunts a 29% invalidity risk into an 84% invalidity risk based on decreased constitutional and legal protections for patentees. *See also* https://usinventor.org/assessing-ptab-invalidity-rates/ (explaining statistical methodology in detail). Even if fact disputes could be considered at this stage (they cannot), the Director's challenge is both irrelevant and incorrect. It is irrelevant because 84% is still higher than the Director's proposed 54.7% or 42.6% (the numbers he proposes to substitute for Plaintiffs' 29% evidence). (Reply at 4). And for Plaintiff Maalouf, **any** PTAB statistic is higher than his personal **0%** risk outside of Microsoft's IPR because no parallel litigation exists. The Director's proposed statistics are incorrect because the paper with the 42.6% number reveals in a later table that of 636 final district court outcomes, only 188 embodied a "Loss on Invalidity," which amounts to exactly 29.6%—corroborating **Plaintiffs'** result. John R. Allison, *Our Divided Patent System,* 82 U. Chi. L. Rev. 1073, 1103 (2015). The Director's other paper was not focused on accuracy in this statistic, but gathered validity and invalidity outcomes to test hypotheses about whether "valid" patents are more influential than "invalid" patents in advancing technology. Jonathan H. Ashtor, *Does Patented Information Promote the Progress of Technology?*, 113 Nw. U.L. Rev. 943, 964 (2019).[1] Increased risk is real.

**US Inventor**: The Director miscites *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010), to argue that US Inventor must show "significant" resource diversion and service impairment for Article III standing. (Reply at 5). The Fifth Circuit clarified in *OCA-Greater*

---

[1] The Director tries to muddy the apples-to-apples statistical comparison by arguing that the "reasonable likelihood to prevail" PTAB standard is different from attorney obligations under Rule 11. (Reply at 4). The Director is wrong. *Lipin v. Hunt*, 538 F. Supp. 2d 590, 605 (S.D.N.Y. 2008) (Rule 11 requires "factual contentions with at least a ***reasonable likelihood*** of evidentiary support") (emphasis added); *see also TQP Dev., LLC v. 1-800-Flowers.com*, No. 2:11-CV-248-JRG-RSP, 2013 U.S. Dist. LEXIS 101781, at *8-9 (E.D. Tex. July 19, 2013) (Rule 11 for patentee requires "reasonable chance of proving infringement" under Federal Circuit decision).

*Houston v. Texas* that "Article III injury-in-fact need not be substantial," and that its remarks in *City of Kyle* were not "a heightening of the *Lujan* standard, but an example of how to satisfy it by pointing to a non-litigation related expense." 867 F.3d 604, 612 (5th Cir. 2017). The Fifth Circuit reaffirmed that injury for standing "need not measure more than an identifiable trifle." *Id*.

US Inventor thus has Article III standing. US Inventor diverted resources to educational efforts on the topic at hand, to help its inventor-membership deal with PTAB unclarity and opacity in its standards—actions not otherwise needed had the agency acted lawfully. (ECF#20, at 10, discussing US Inventor's writings and outreach). This diversion of resources—ignored by the Director—is injury that qualifies for organizational plaintiff standing. *Arcia v. Florida Secretary of State*, 772 F.3d 1335, 1341-42 (11th Cir. 2014) (organizations diverted resources to address mis-identification of citizenship); *Scott v. Schedler*, 771 F.3d 831, 836-39 (5th Cir. 2014) (NAACP spent additional time on registration drives); *OCA*, 867 F.3d at 612 ("not large" injury resulting from extra time spent educating voters about a new Texas voting law).

The Director also objects to additional evidence of diverted resources **beyond** those educational expenditures. True, expenditure of resources on advocacy usually is not enough alone to show an organization's Article III injury. But the Director incorrectly characterizes the evidence in this case. For example, the otherwise-unneeded creation of a web portal facilitated membership to give comments to the USPTO on viewpoints about discretionary institution. This diversion of IT resources was not the organization's advocacy, since membership was free to comment inconsistently with US Inventor's position. Likewise, the Director does not dispute that US Inventor's pre-litigation intra-agency petition for rulemaking (filed August 27, 2020) is not under review in this lawsuit, and was not generated for purposes of this litigation. It was a pure mitigation effort to address the problem directly.

Finally, the Director misconstrues case law on informational injury, contending that the content of notice-and-comment rules is never the kind of information whose absence can trigger such injury. (Reply at 6-7). "The law is settled that a denial of access to information qualifies as an injury-in-fact where a statute (on the claimant's reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them." *Campaign Ctr. & Democracy 21 v. FEC*, 952 F.3d 352, 356 (D.C. Cir. 2020) (cleaned up). The Director's citation of *Biological Diversity v. Bernhardt*, 442 F. Supp. 3d 97, 111-13 (D.D.C. 2020) (pending decision after D.C. Circuit appellate argument), does not help him. That decision turned on lack of linkage between what the notice-and-comment regulations would state, and the information needed to mitigate the claimed injury. *Id.* at 109-10. Here the link is present. With lawfully promulgated rules in place, US Inventor will be able to disseminate to membership definitively how to use the discretionary denial "off-ramp" to escape PTAB institution. Likewise, the Director misconstrues *AAVS v. USDA*, 946 F.3d 61 (D.C. Cir. 2020), where failure itself to issue notice-and-comment standards caused informational injury sufficient to qualify for Article III standing. *Id.* at 619 (analogous to US Inventor's injurious diversion of resources, identifying otherwise unneeded mitigation activities caused by non-regulation of birds).

## II.   COUNT I PLEADS A CAUSE OF ACTION

Plaintiffs pointed out that precedent (such as *AAVS*) does not require exhaustion prior to bringing a stand-alone Section 706(1) claim to commence notice-and-comment rulemaking based on a statutory command (*i.e.*, 35 U.S.C. § 316(a)). (ECF#20, at 11-13). In Reply, the Director ignores precedent (such as *AAVS*) that does not require exhaustion prior to bringing such a Section 706(1) claim. Oddly and incorrectly, the Director states that Plaintiffs "provide no support for such a distinction." (Reply at 7-8). Meanwhile, the Director's authority (*Gilmore v. Weatherford*)

4

involved neither notice-and-comment, nor a statutory command to perform it, but found a failure to exhaust only because a set of particular agency rules and appeal procedures covered the agency action plaintiffs attempted to achieve through litigation. 694 F.3d 1160, 1167-70 (10th Cir. 2012) (rejecting assertions "[u]nder these circumstances," while rejecting argument that Section 706(1) is "categorically exempt" from exhaustion, which Plaintiffs here are not making).

The Director also argues that the Section 316(a)(2) statutory text "standards for the showing of sufficient grounds to institute under section 314(a)" somehow excludes discretionary institution standards. (Reply at 8-9). But the Director ignores statutory language. Section 314(a) is the authority giving rise to discretionary standards in the first place. (ECF#20, at 14, citing cases). And contrary to any wishful thinking, the text of Section 316(a)(2) does not limit Congress's command to promulgate regulations to "standards for the showing of [*a reasonable likelihood that a petitioner would prevail*] under section 314(a)." The broad language that Congress enacted includes discretionary standards in its scope: "sufficient grounds to institute."

The Director's final arguments against Count I are nonsensical. First, the Director states that "nothing requires an adjudicative body to address issues in a particular order or to address every possible basis for its decision." (Reply at 8). This is irrelevant to the statutory construction question before the Court. Next, the Director presents a straw man argument when stating, "the fact that a party bears two burdens does not make those burdens one and the same." (Reply at 8-9). Plaintiffs never argued otherwise. Plaintiffs' point (left unrebutted by the Director) is that petitioners bear a burden to make "a showing" (the statutory language in Section 316(a)(2)) when seeking institution under the PTAB's binding discretionary institution standards.

Finally, the Director suggests that discretionary "standards for the showing of sufficient grounds to institute" are distinct from discretionary "standards to deny." (Reply at 9, emphasis in

original). Not so. As pointed out (ECF#20, at 14-15 and 14 n.2), these are one and the same. *See Biodelivery Scis. Int'l, Inc. v. Aquestive Therapeutics, Inc.*, 935 F.3d 1362, 1364 (Fed. Cir. 2019) (calling it "discretion to institute IPR" when speaking of discretion to **deny** institution despite reasonable likelihood of unpatentability in part). All attacks on the sufficiency of Count I fail.

### III.  COUNT II PLEADS A CAUSE OF ACTION

#### A.  Designation of Precedential Institution Standards is Final Agency Action

The Reply asserts that Count II does not concern a "final" agency action, because precedential designation of PTAB decisions containing institution-denial standards "has no direct legal consequences." (Reply at 9, citing *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). The Director's position is absurd. SOP 2 dictates that as soon as the Director makes the relevant decisions "precedential," from that moment forward every PTAB panel must follow them. Such designations were clearly "final." When agency action withdraws some previously-held discretion, that action "alter[s] the legal regime," "binds" the entity, "and thus qualifies as final agency action." *NRDC v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011). That is what happened here with the Director marking certain discretionary-standard decisions "precedential."

The Reply states that institution decisions have no "legal effect on the parties," thus the announcement of binding standards governing such institution decisions must clearly not. (Reply at 10). But institution decisions have massive effects on the parties, as recited in detail in Plaintiffs' opposition brief. (ECF#20, at 18-19). In any event, the Director cites no authority to justify diverting the Court's attention to downstream events that occur *after* the agency action in question, to decide if the action itself was "final." That makes no logical sense, and is unsupported by citation to authority. The Reply also fails to rebut Plaintiffs' point that the precedential designations here bind the agency itself. (ECF#20, at 17-18).

6

Rather than confront Plaintiffs' case law, the Director cites a single decision that included a "final" decision, but held that it was not the agency who made it. (Reply at 10, citing *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (holding that the President executes the "final" action concerning the census, not the Secretary of Commerce in delivering an intermediate population report, making nonjusticiable a lawsuit attacking that report)). This authority is inapposite. It does not overrule well-established authority that considers agency actions "final" when the agency itself becomes bound under them. Nor does the Director gain by citing *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 597-98 (5th Cir. 1995). There, the FDA enforcement guidelines were explicit that "even if the factors are present, the FDA retains discretion whether to bring an enforcement action." *Id.* By contrast here, SOP 2 has allowed "precedential" designations on "binding" adjudication decisions that require "similar fact" situations to be decided identically. And the Director's citation to *Planned Parenthood of Wisconsin v. Azar*, 316 F. Supp. 3d 291, 300-302 (D.D.C. 2018) (discussing a "scoring" guideline for grant applications), is puzzling. That decision turned on the law's unique treatment of grant awards: "courts usually recognize final agency action only after grant awards issue." *Id.* at 300-01. This is not a grant award case. Plus, the scoring guidelines were not a final agency action because the decisionmakers were not "legally bound" to consider them. *Id.* at 302. This is in sharp contrast to precedential PTAB decisions under SOP 2. (ECF#13-3, at 11: "binding").

Indeed, precedent forecloses the Director's argument that an agency action is "nonfinal" when it sets guidelines for the agency's future case-by-case use of discretion. In *NRDC v. EPA*, the EPA issued a Guidance document for Regional Air Division Directors to use when considering implementation plans submitted by industry to address ozone. 643 F.3d at 316. That document required director-consideration of "alternative" plans that, if approved, avoided penalties, even if

7

the pure statutory language would make the polluter penalty-eligible. *Id.* at 319. Each director retained discretion to impose penalties, even after required consideration of qualifying "alternatives." *Id.* The EPA argued "nonfinality" because "prior to its issuance, a regional director could have considered an alternative." *Id.* The D.C. Circuit responded: "[p]erhaps so, but that director also retained discretion, now withdrawn by the Guidance, to reject the alternative solely for failing to [find statutory ineligibility for penalties]." *Id.*

The withdrawal of discretion behind the D.C. Circuit's rejection of the EPA's argument in *NRDC* precisely applies here. Before precedential designation of discretionary-denial standards, each PTAB panel "could have considered" the same facts addressed by the standards to deny institution. And after, each PTAB panel still retains discretion to institute IPR and PGR after considering the standards (*e.g.*, if presented with facts not "substantially similar" to the precedential decisions). But those panels "also retained discretion, now withdrawn by the [precedential designations], to reject [that use of discretion] solely for failing to [find statutory ineligibility for institution]." The fact that discretionary standards will be deployed on a case-by-case basis cannot bar APA review of agency action mandating the use of those standards.

Finally, the Reply cannot refute that the challenged standards "obligate parties to make a particular showing to the agency"—another reason they pass the *Bennett* test for finality. (ECF#20, at 18). *JEM Broad. Co., Inc. v. FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994), is not to the contrary. There, the agency moved up the timeline for submission of certain license application information. After finding that the issue is "one of degree," the court held that such a procedural change was not a substantive effect sufficiently grave that there was a need to safeguard the policies under the APA, hence it was not a true change in any obligation of the parties. *Id.* The opposite holds here, where the challenged precedential standards are more substantive than simply altering the timing

8

of inevitable presentations. They are instead standards by which a challenged patentee may exit a high-invalidation-risk proceeding.[2]

Since all aspects of the *Bennett* test are met here, the Court should not dismiss Count II on alleged grounds that no final agency action is present.

### B. Precedential Institution Standards are Not General Statements of Policy

As a last resort, the Reply asserts that the challenged precedential standards are merely statements that advise the public prospectively of the manner in which an agency proposes to exercise a discretionary power, and thus do not require notice-and-comment. (Reply at 12, quoting *Lincoln v. Vigil*, 508 U.S. 182, 196-97 (1993)). But the standards in question *deprive* the Board of discretion. They are no mere "proposal" of how a power might be exercised, but a statement of how the institution decision *must* occur. They are "binding" and must be followed when there are "similar facts" in common with the precedential decisions. (ECF#13-3, at 11).

This puts the rules squarely in the category known as "legislative" rules, requiring notice-and-comment. *Casa de Md. v. DHS*, 924 F.3d 684, 702 (4th Cir. 2019). In fact, even if a government document existed that stated individual PTAB panels had "discretion" whether to apply the rule sets (no such document does exist), that would still not answer the question because the "discretionary" label can be a mere pretext that the Court must set aside. *Texas v. United States*, 809 F.3d 134, 172-73 (5th Cir. 2015) (analyzing Deferred Action for Parents of Americans and

---

[2] The Reply purports to quote from *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) at page 11, but the resulting sentence conflates two different things. The cited case states that "interpretive rules or statements of policies" are actions that "generally do not qualify" as final agency actions. *Id.* The mistaken quotation in the Reply, on the other hand, distorts the meaning with its statement that "alter[ing] the manner in which the parties present themselves or their viewpoints to the agency" are the named actions that "generally do not qualify."

9

Lawful Permanent Residents ("DAPA") memos that "purport to grant discretion," but were found to be "binding" because the agency followed them 95% of the time).

The facts of the present case are even stronger than those that the Fifth Circuit confronted in *Texas* when finding that the DAPA program memos embody "legislative" rules. Here, SOP 2 calls the standards and the precedential decisions that contain them "binding" on future panels. And, as the dissent in *Texas* conceded, the majority there held that the DAPA memos were "binding" (thus embodying legislative rules), despite the fact that those memos "channel[led] agency enforcement discretion—through the use of non-exhaustive, flexible criteria." *Id.* at 204-06 (King, J., dissenting) (highlighting that the "last criterion" in the DAPA memo was "entirely open-ended," allowing consideration of "other factors"). Consequently, under Fifth Circuit law, the Director raises no meritorious argument when alleging that the binding precedential decisions at issue here contain non-exhaustive or flexible criteria, or contain an "other factors" criterion that a PTAB panel might consider case-by-case. (Reply at 9-13).

Likewise, *Lincoln v. Vigil* is also inapposite. There, the agency decisions revoked a policy for expenditure of unrestricted agency funds. An announcement that an agency will "discontinue a discretionary allocation of unrestricted funds from a lump-sum appropriation," 508 U.S. at 198, bears no resemblance to the Director's SOP 2 precedential designations.

Since the rules in question are "legislative" rules, not "general statements of agency policy," the Court should not dismiss Count II on alleged grounds that an exception to notice-and-comment rulemaking exists here

## IV.     CONCLUSION

For the reasons set forth above, the Court should deny the motion to dismiss.

Dated: May 10, 2021　　　　　　　　　Respectfully submitted,

_/s/ Michael Smith_

Michael C. Smith, State Bar No. 18650410
Siebman, Forrest, Burg & Smith, LLP
113 E. Austin Street
Marshall, Texas 75670
Office: (903) 938-8900
michaelsmith@siebman.com

Robert P. Greenspoon. State Bar No. 6229357
Flachsbart & Greenspoon, LLC
333 N. Michigan Ave., Suite 2700
Chicago, IL 60601
Office: (312) 551-9500
rpg@fg-law.com

ATTORNEYS FOR PLAINTIFFS
US INVENTOR, INC., et al