# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
September 30, 2022
Lyle W. Cayce
Clerk

No. 21-40601

US Inventor Incorporated; Tinnus Enterprises, L.L.C.;
360 Heros, Incorporated; Ramzi Maalouf; Larry Golden;
World Source Enterprises, L.L.C.; E-Watch,
Incorporated,

*Plaintiffs—Appellants*,

*versus*

Katherine K. Vidal, *Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office*,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 2:21-CV-47

Before King, Elrod, and Southwick, *Circuit Judges*.
Per Curiam:[*]

---

[*] Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

Plaintiff-Appellants appeal the district court's judgment dismissing their suit for lack of standing. We affirm the judgment of the district court.

## I.

In 2011, Congress passed the America Invents Act ("AIA"). The AIA established an executive adjudicatory body called the Patent Trial and Appeal Board ("PTAB") within the U.S. Patent and Trademark Office ("PTO"). 35 U.S.C. § 6(a). The AIA creates a variety of avenues for patent challengers to contest the validity of a patent before the PTAB. Notable for this case are two such avenues: *inter partes* review ("IPR") and post-grant review ("PGR"). *See id.* § 6(c).

IPRs and PGRs both have two phases: an institution phase and a trial phase. The institution phase's purpose is for the PTAB to determine whether it should institute a trial on the merits. During an IPR, the patent challenger must demonstrate "that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." *Id.* § 314(a). During a PGR, the patent challenger must demonstrate "that it is more likely than not that at least 1 of the claims challenged in the petition is unpatentable." *Id.* § 324(a). If such showings are not met, the PTAB must deny institution and the proceeding ends there. *Id.* §§ 314(a), 324(a).

Even if the patent challenger does make the statutory showing, the PTAB may still choose not to institute a trial. This is so because, under Sections 314(a) and 324(a), "the agency's decision to deny a petition is a matter committed to the Patent Office's discretion." *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 273 (2016) (regarding IPRs); *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1049 (Fed. Cir. 2017) (regarding PGRs). That said, the PTAB's discretion is cabined by Congress, which requires that "[t]he [PTO] Director shall prescribe regulations . . . setting

No. 21-40601

forth the standards for the showing of sufficient grounds to institute" or deny either an IPR or PGR trial. *See* 35 U.S.C. §§ 316(a)(2), 326(a)(2).

Since the AIA was passed, PTAB panels have examined when "discretionary denials" are appropriate and have adopted a nonexclusive list of factors for consideration. *See Gen. Plastic Indus. Co. v. Canon Kabushiki Kaisha*, No. IPR2016-01357, 2017 WL 3917706 (P.T.A.B. Sept. 6, 2017); *NHK Spring Co. v. Intri-Plex Techs., Inc.*, No. IPR2018-00752, 2018 WL 4373643 (P.T.A.B. Sept. 12, 2018); *Advanced Bionics, LLC v. MED-EL Elektromedizinische Geräte GmbH*, No. IPR2019-01469, 2020 WL 740292 (P.T.A.B. Feb. 13, 2020); *Apple Inc. v. Fintiv, Inc.*, No. IPR2020-00019, 2020 WL 2126495 (P.T.A.B. Mar. 20, 2020). The director of the PTO (the "Director") has designated these decisions "precedential" in the PTAB's Standard Operating Procedure, meaning that these decisions are "binding Board authority in subsequent matters involving similar facts and issues." PTAB, STANDARD OPERATING PROCEDURE 2 (REVISION 10), at 11 (2018), https://www.uspto.gov/sites/default/files/documents/SOP2%20R10%20FINAL.pdf.

This brings us to the instant case. Plaintiff-Appellants comprise several individual patent holders and US Inventor Incorporated ("US Inventor"), an organization representing patent holder interests. As beneficiaries of discretionary denials (because such denials avoid potentially costly IPRs or PGRs), Plaintiff-Appellants desire additional "offramps" to avoid PTAB trials. Consequently, they brought a two-count suit seeking a preliminary and permanent injunction against the Director. First, they argued that Sections 316(a) and 326(a) mandate that the Director engage in notice-and-comment rulemaking and, thus, that the Director must go through the Administrative Procedure Act's ("APA's") notice-and-comment process to issue standards for when discretionary denial is appropriate. Therefore, they requested that the district court compel the

3

No. 21-40601

Director to engage in notice-and-comment rulemaking when issuing discretionary denials. Second, they asserted that the issuance of the Standard Operating Procedure reflected that the Director engaged in rulemaking without notice and comment, and thus the Standard Operating Procedure must be set aside as unlawful. The Plaintiff-Appellants further sought a preliminary and permanent injunction enjoining the Director from granting institution in any AIA patent trial pending completion of the compelled rulemaking.

The Director moved to dismiss the complaint, arguing that the plaintiffs lacked individual or organizational standing. The district court agreed and dismissed the complaint. The court explained that the individual plaintiffs could not show a legally cognizable injury because their alleged injury—the potential increased risk to their patents if they do not receive a discretionary denial during the institution stage—was not sufficiently concrete. Additionally, the court found no organizational standing under either of US Inventor's proffered theories because it (1) could not show that the purported actions (or inactions) of the Director caused the organization to expend resources beyond its normal expenditures and (2) did not suffer an informational injury because it was not denied any particular information to which it was entitled.

Plaintiff-Appellants timely appealed the decision to both this circuit and the Federal Circuit. The appeal in the Federal Circuit is being held in abeyance pending this court's decision.

## II.

Before proceeding to the standing analysis, we first note that there are two independently necessary requirements of subject matter jurisdiction. "Federal courts are courts of limited jurisdiction," and we "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life*

4

No. 21-40601

*Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). In other words, constitutional *and* statutory authorizations are both necessary requirements for us to have subject matter jurisdiction to hear a case. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998); Erwin Chemerinsky, Federal Jurisdiction 300 (8th ed. 2020).

This appeal implicates both such requirements. In disputing the district court's dismissal for lack of Article III standing, parties disagree on whether we have the constitutional authority to decide this instant dispute as part of our jurisdiction over "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. And separately, parties dispute whether we have the statutory authority to hear this case without transferring it to the Federal Circuit, which has exclusive appellate jurisdiction over appeals "arising under . . . any Act of Congress relating to patents." 28 U.S.C. § 1295(a)(1).

To exercise jurisdiction over this case, we would need to be satisfied that both the constitutional and statutory requirements of subject matter jurisdiction are met. For the reasons below, we agree with the district court that Plaintiff-Appellants are without Article III standing. We thus hold that the district court lacked subject matter jurisdiction due to an absence of constitutional authorization. *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (citing *United States v. Corrick*, 298 U.S. 435, 440 (1936)) (requiring us to confirm the district court's jurisdiction). Because such an absence precludes jurisdiction, even in the face of clear statutory authority, we do not reach the question of whether we are statutorily allowed to hear (or transfer) this case.

## A.

Plaintiff-Appellants assert a variety of standing theories. First, they argue that certain plaintiffs have individual standing. This court "review[s] a dismissal for lack of Article III standing de novo." *Abraugh v. Altimus*, 26

5

No. 21-40601

F.4th 298, 302 (5th Cir. 2022). To have Article III standing, a plaintiff must demonstrate that he or she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

To show an injury in fact, a plaintiff must also establish that the injury is "(a) concrete and particularized" and "(b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted). Although a concrete injury may be imminent when derived from the failure of an agency to engage in notice-and-comment rulemaking, *see Massachusetts v. EPA*, 549 U.S. 497, 521–22 (2007), mere probability of a disfavored outcome does not suffice to create a legally cognizable injury, *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 538–39 (5th Cir. 2019). Instead, the injury itself must be certainly impending, not speculative. *See Texas v. United States*, 787 F.3d 733, 747–48 (5th Cir. 2015) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

Here, Plaintiff-Appellants allege a risk of future harm, which can be a legally cognizable injury if "sufficiently imminent and substantial." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021). Specifically, Plaintiff-Appellants are concerned with the increased risk[1] of patent invalidation arising out of the absence of their notice and opportunity to comment on the Director's relevant (i.e., related to discretionary denials) modifications to the Standard Operating Procedure. A patentee's property rights in his or her patents are legally protected interests, and invalidation

---

[1] The theory Plaintiff-Appellants posit is that the risk of a patent being invalidated is higher in an (1) IPR or PGR versus (2) a district court proceeding.

6

No. 21-40601

would upset these interests. *See, e.g.*, *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 730 (2002) (stating patents are property rights).

But it is not clear that invalidation is imminent here for Plaintiff-Appellants. Instead, such a purported injury is too speculative to create standing. For the original procedural deficiency (Plaintiff-Appellants' lack of notice and opportunity to comment) to result in the stated harm (an increased risk of invalidation compared to a district court challenge), the following series of events must occur: (1) a third party must challenge one of Plaintiff-Appellants' patents; (2) after a challenge occurs, the challenger must prove that he or she is likely to succeed at blocking issuance of or invalidating a patent;[2] (3) the PTAB must decide whether to apply the current discretionary denial factors to that patent;[3] (4) the PTAB must not exercise its discretionary denial; and (5) the resulting IPR or PGR proceeding must create a significantly higher likelihood[4] (i.e., increased risk of harm) of invalidation as compared to a district court proceeding.

---

[2] *See* 35 U.S.C. §§ 314(a) (regarding IPRs), 324(a) (regarding PGRs).

[3] *See Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 273 (2016) (regarding IPRs); *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1049 (Fed. Cir. 2017) (regarding PGRs).

[4] Plaintiff-Appellants make much of the higher invalidity rate in IPR and PGR proceedings (84%) as opposed to that in Article III proceedings (29%). Our summary of the steps leading up to an IPR or PGR underscores our hesitancy in relying too closely on these invalidity rate statistics to support a finding of increased risk of harm. For a challenger to even make it to an IPR or PGR, he or she must show a likelihood of success before the PTAB, which must then decide not to exercise a discretionary denial. Bringing a successful challenge in the district court is different. A challenger in district court does not need to initially show a likelihood of success, and the success of such a challenge also does not depend on the PTAB's discretionary denials. We note such differences only to say that simply comparing patent challenges in an IPR/PGR to challenges in a district court is likely an apples-to-oranges comparison that fails to meet the rigor we expect in a standing analysis.

No. 21-40601

Non-occurrence of a single event in this series breaks the chain of causation between the alleged procedural failing and resulting harm. And none of these events is guaranteed to occur, as each event is an outcome dependent on the specific choices made by independent parties (e.g., a challenger seeking IPR choosing how to present evidence when arguing for a likelihood of success). Plaintiff-Appellants have some direct knowledge of and control over their own choices in this series of events, but they must necessarily speculate and make assumptions about how other independent parties (e.g., challengers, the PTAB) will act.

The Supreme Court rejected standing premised on such a "speculative chain of possibilities" in *Clapper*, 568 U.S. at 414. In that case, the plaintiffs challenged a new Government surveillance program and alleged injury from the Government's interception of plaintiffs' communications with foreign contacts. *See id.* at 404–07. The Court held that plaintiffs lacked standing because connecting the injury (the interception of communications) with the proffered cause (the new program) involved speculating how the Government and Article III judges would act in a "chain of possibilities," namely the complex series of events needed for the Government to actually surveil plaintiffs.[5] *See id.* at 410. Such speculation meant that the resulting

---

[5] Specifically, the Court outlined as insufficiently imminent the speculative fear that:

> (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy § 1881a's many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts.

8

injury to plaintiffs was not "certainly impending" to constitute an injury in fact despite an "objectively reasonable likelihood" of plaintiffs' communications being intercepted. *See id.*

This case presents a similar chain of events requiring us to speculate—at minimum—whether a (1) third-party challenge will occur; (2) how the PTAB would rule on the challenged portions of the relevant patents; (3) how the PTAB would consider its discretionary denial factors in (4) not exercising discretionary denial; and (5) how a district court would otherwise rule on the patent claims at issue. Thus, to clearly connect Plaintiff-Appellants' procedural harm to their injury, we must engage in conjecture about how independent third parties, i.e., the PTAB and a district court, would act. *Clapper* rejected such conjectures as speculation insufficient to support a redressable injury. *See id.* We follow the Court and hold that Plaintiff-Appellants' similarly speculative theory of injury precludes their ability to establish individual standing.[6]

Plaintiff-Appellants' arguments to the contrary are unavailing. They contend their injury is like those in *Sierra Club v. Marsh*, 872 F.2d 497, 503 (1st Cir. 1989); *TransUnion*, 141 S. Ct. at 2210; *Massachusetts v. EPA*, 549 U.S. at 522–26; and *City of Dania Beach v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007). But in all those cases, and unlike that of Plaintiff-Appellants', the injuries were actual and imminent; they did not require speculation. *See Sierra Club*, 872 F.2d at 498–99 (planned construction of a marine dry cargo terminal would clear 124 acres of wildland); *TransUnion*, 141 S. Ct at 2209

---

*Clapper*, 568 U.S. at 410.

[6] This lack of individual standing also defeats any claim to associational standing. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (holding that an association's members must "otherwise have standing to sue in their own right" to have associational standing).

(misleading OFAC alerts actually placed into plaintiffs' credit reports sent to third parties); *Massachusetts*, 549 U.S. at 521–22 (coastlines were already receding and would recede further); *Dania Beach*, 485 F.3d at 1185–86 (new regulations would route more jets into neighborhood and thus increase noise, soot, and exhaust fumes).[7] Given the specific, uncertain series of events required under Plaintiff-Appellants' theory of harm, we find their injury more closely analogous to the impermissibly speculative theory of injury rejected in *Clapper*.

Plaintiff-Appellants also argue that the district court should have assumed a plaintiff victory on the merits when considering standing. This would require us to assume that the Director acted unlawfully in evading notice-and-comment rulemaking on discretionary denial off-ramps and that lawful rulemaking would provide better off-ramps for patentees to avoid IPR and PGR. But even if we assume this to be true, we must still make a series of improperly speculative assumptions. Assuming different standards for discretionary denials does not affect how third parties and district courts would act on certain patents (e.g., by challenging or invalidating them); furthermore, the role of the PTAB elsewhere in the chain of events, e.g., in considering challenged portions of the patents, would remain unaffected. Thus, assuming Plaintiff-Appellants' win on the merits and positing unlawful rulemaking cannot overcome the lack of imminency defeating Plaintiff-Appellants' individual standing claims.[8]

---

[7] Moreover, to the extent the Plaintiff-Appellants cite similarities to *Lujan* and *Summers v. Earth Island Institute*, they ignore that in both of those cases, the plaintiffs lacked standing because their injuries were too speculative. *Lujan*, 504 U.S. at 578; *Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009).

[8] Plaintiff-Appellants make two other arguments that we address briefly here. First, a district court case Plaintiff-Appellants cite, *Apple Inc. v. Iancu*, No. 20-CV-06128, 2021 WL 5232241 (N.D. Cal. Nov. 10, 2021), is not binding on us, and, in any event, is

No. 21-40601

**B.**

Next, Plaintiff-Appellants argue that US Inventor has organizational standing. An organization seeking standing must meet the same standing requirements governing individual standing, *NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010), and we again review this issue de novo. *Abraugh*, 26 F.4th at 302. Plaintiff-Appellants present two theories of injury, and we address each in turn.

Plaintiff-Appellants first assert that they have organizational standing under a theory of resource diversion. Under this theory, an organization has a cognizable injury if it exerts resources to counteract effects of an unlawful action by the Government. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610–12 (5th Cir. 2017). Although the injury need only be an "identifiable trifle," *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999) (citation omitted), it must nevertheless perceptibly impair the organization's ability to provide its activities, *City of Kyle*, 626 F.3d at 238. Uninterrupted operations or a "redirect[ion]" of resources towards litigation and legal counseling are insufficient. *La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000) (citation omitted).

Two cases primarily guide our analysis here. In *OCA-Greater Houston*, the plaintiff non-profit successfully demonstrated a redressable injury in its challenge to a Texas voting law imposing a restriction on interpretation

---

distinguishable as involving the standing of materially different parties (namely, patent challengers) who already had specific suits dismissed due to certain discretionary denial factors allegedly applied unlawfully. *Id.* at *4. Second, Plaintiff-Appellants' argument that an individual plaintiff, Ramzi Maalouf, has standing under a slightly different theory is also unavailing. The requested relief here, prospective invalidation of the factors and a requirement to engage in rulemaking, would not redress his injury for future patents. *See City of L.A. v. Lyons*, 461 U.S. 95, 105–06 (1983) (plaintiff has no standing to challenge future injuries absent immediate, specific threat of future injury).

assistance for English-limited voters. *OCA-Greater Hous.*, 867 F.3d at 606–07. The court held that OCA-Greater Houston was injured by having to exhaust "additional time and effort . . . explaining the Texas provisions at issue to limited English proficient voters [because] addressing the challenged provisions frustrate[d] and complicate[d] its *routine* community outreach activities." *OCA-Greater Hous.*, 867 F.3d at 610 (emphasis added). By contrast, routine lobbying behavior did not suffice to create standing in *City of Kyle*, 626 F.3d at 238–39. In *City of Kyle*, the plaintiffs could not show an injury when its prelitigation actions involved only lobbying against a set of challenged ordinances and engaging in a "$15,000 study on the impact of the revised ordinances" because these were part of the routine operations of the lobbying organization. *See id.* at 238. Reading these cases together, we must thus consider whether US Inventor's proffered expenditures are more similar to the additional expenditures at issue in *OCA-Greater Houston* or the ordinary, routine expenditures in *City of Kyle*.

We begin with a summary of US Inventor's activities and its purported expenditures. US Inventor engages in lobbying, and states that "part of its educational mission [is to] . . . provide[] information to its membership to help them deal with potential AIA trial reviews," which it does by "educat[ing] the public by providing information about the factors that will lead to a grant, versus a denial, of institution of AIA trials, particularly on discretionary factors." Plaintiff-Appellants suggest that US Inventor suffered injury by expending resources to respond to the Director's issuance of the Standard Operating Procedure without notice and comment. They argue that US Inventor "needed to consume time and resources that would not otherwise be spent had there been lawful promulgation of notice and comment regulations" because it took additional time to educate its membership about AIA trial reviews and made US Inventor give advice against the patenting of certain inventions.

12

No. 21-40601

Against this general backdrop, Plaintiff-Appellants point to three particular endeavors as their expending additional resources in response to the Director's flawed issuance of the Standard Operating Procedure. First, US Inventor "dedicated website resources and personnel time to creating a portal for inventors to deliver their opinions to the Director on their yearning for certainty in institution phase discretionary decisions, and for notice-and-comment rules." This portal includes a pre-written series of requests that a user is to copy and paste on the Federal Register website to consider in the PTO's Request for Comments on Discretion to Institute Trials before the Patent Trial and Appeal Board. *Submit Comments to the USPTO*, US Inventor, https://usinventor.org/ptabcomments (last visited Sept. 12, 2022). Second, a US Inventor fellow issued commentary about the current discretionary rules. And third, US Inventor petitioned for notice-and-comment rulemaking.

These endeavors by Plaintiff-Appellants reflect US Inventor's routine operations as a lobbying and educational group. Their endeavors are dissimilar from the organizational resources expended in *OCA-Greater Houston* and more akin to the expenditures in *City of Kyle*. In *OCA-Greater Houston*, the plaintiff's expended efforts constituted more than "routine" community outreach activities. *OCA-Greater Hous.*, 867 F.3d at 610. But here, all of Plaintiff-Appellants' endeavors reflect US Inventor's routine operations as a lobbying and educational group. Its web portal is an educational and lobbying tool encouraging the PTO to adopt rules in its favor, as is its petition for rulemaking. Similarly, while it is true that US Inventor's publications offered potentially different information from what they would contain had there been notice-and-comment rulemaking, this does not reflect a change in its routine practice of educating its members "by providing information about the factors that will lead to a grant, versus a denial, of institution of AIA trials." Thus, like the plaintiffs in *City of Kyle*, Plaintiff-

13

No. 21-40601

Appellants have not shown how their specified activities actually differ from US Inventor's routine operations or how the Director's alleged failure to promulgate rulemaking has caused US Inventor to depart from its ordinary activities. *See City of Kyle*, 626 F.3d at 238 ("Plaintiffs have not explained how the activities described above, which basically boil down to examining and communicating about developments in local zoning and subdivision ordinances, differ from the HBA's routine lobbying activities.").[9] Therefore, US Inventor has not suffered an injury-in-fact under a resource diversion theory because it has not expended resources outside of its ordinary course of operations.

Plaintiff-Appellants next claim they have organizational standing based on an informational injury. An informational injury occurs if a plaintiff

---

[9] This is also what renders US Inventor's situation distinct from the Avian Welfare Coalition's (the "AWC") in *American Anti-Vivisection Society v. United States Department of Agriculture*, 946 F.3d 615 (D.C. Cir. 2020). That case involved a 2002 amendment to the Animal Welfare Act that required the USDA to pass general standards regarding the "humane handling, care, treatment, and transportation of animals." *Id.* at 617 (quoting 7 U.S.C. § 2143(a)(1)). The USDA never did, and so the Avian Welfare Coalition, whose "mission is to protect and raise awareness about the plight of captive birds," brought suit against the USDA seeking to compel rulemaking. *Id.* at 618-19. The AWC explained that, ordinarily, it would rely on the USDA's publication of information to educate the public on humane treatment, but due to the USDA's failure, the AWC was forced to develop how-to guides, webinars, and informational pamphlets that "were not part of" its "normal annual expenditures," which the court held was sufficient to establish an injury. *Id.* at 619.

While AWC's predicament is similar to US Inventor's plight—both were engaged in the publication of information that would not have occurred had the relevant agency engaged in notice-and-comment rulemaking—US Inventor has not actually engaged in a practice outside of its ordinary scope. It educates the public "by providing information about the factors" considered by the PTAB, whether the Director adopts those factors with public comment or through ad hoc decisions. The AWC, having no guidance, instead had to research and create its own standards of care when it would ordinarily engage in what US Inventor is currently doing—that is, educating and commenting on the standards that have been passed. These two cases are thus distinguishable.

14

No. 21-40601

fails to obtain information that must be publicly disclosed pursuant to a statute. *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 429–30 (5th Cir. 2013). Plaintiff-Appellants argue that notice-and-comment rulemaking is statutorily compelled information that US Inventor was denied.

Courts that have faced this issue have agreed that a failure to issue notice-and-comment rulemaking does not create a right to information for the purpose of standing.[10] *Bensman v. U.S. Forest Serv.*, 408 F.3d 945, 958–60 (7th Cir. 2005) (distinguishing laws that create a notice-and-comment rulemaking requirement from laws that create a specific right to information); *Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1259 (9th Cir. 2010) (agreeing with the Seventh Circuit and explaining that a notice-and-comment mandate's purpose is not to disclose information). We agree with their logic. As explained by the Seventh Circuit in *Bensman*, an informational injury can arise from a statute (such as FOIA or FACA) that aims to provide information to the public and then clearly creates a right to such information. *Bensman*, 408 F.3d at 958. When a statute serves some other purpose, such as increasing public participation in the decision-making process, there is no public right to information. *Id.*; *see also Wilderness Soc'y*, 622 F.3d at 1260 (explaining that allowing any procedural injury that results in the plaintiff experiencing informational harm to create a concrete injury "would allow an

---

[10] Plaintiff-Appellants also refer to *American Anti-Vivisection Society* as a case involving an informational injury. However, "informational injury" refers to a narrower subset of injuries where the injury is the denial of information itself. By contrast, *American Anti-Vivisection Society* involved a *monetary* injury arising from resource expenditures due to a failure to pass notice-and-comment regulations. *See American Anti-Vivisection Society*, 946 F.3d at 619 ("These activities, which were not part of [AWC's] normal annual expenditures until the efforts became necessary due to USDA's clear inaction, have caused a consequent drain on the organization's resources." (internal quotations and citation omitted)).

Case 2:21-cv-00047-JRG    Document 105    Filed 11/22/22    Page 16 of 16 PageID #: 2749

No. 21-40601

end run around the Supreme Court's procedural injury doctrine and render its direction in *Summers* meaningless"). The provisions that Plaintiff-Appellants allege create a right to information read only that the Director "shall prescribe regulations . . . setting forth the standards for the showing of sufficient grounds to institute a review." 35 U.S.C. §§ 316(a)(2), 326(a)(2). Assuming *arguendo* that this provision does create a notice-and-comment requirement, the purpose of the statute is to create regulations around the PTAB review process with public comment—it is not to create a public right to any particular information. Thus, the statutes do not form the basis for an informational injury.

In sum, Plaintiff-Appellants do not meet the requirements for Article III standing under any of their proffered theories. The district court thus correctly dismissed the case for lack of subject matter jurisdiction.

## III.

For the foregoing reasons, we AFFIRM.